**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| **JANICE HAWKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:21-cv-50266** |
| | ) | |
| **v.** | ) | **JURY DEMAND** |
| | ) | |
| **ROCKFORD PUBLIC SCHOOLS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>COMPLAINT</u>**

Plaintiff Janice Hawkins ("Ms. Hawkins" or "Plaintiff") through her attorneys at

VILLALOBOS AND ASSOCIATES, brings this lawsuit against the Rockford Public Schools

("RPS" or "Defendant") for damages, and in support thereof alleges the following:

**I.       Summary of Claims**

1.        Ms. Hawkins was a highly accomplished school administrator with RPS for

nearly a decade. Ms. Hawkins received glowing reviews from her supervisors, staff, and parents

throughout her tenure with RPS.

2.        Ms. Hawkins was an Assistant Principal at Jefferson High School from February

2020 through June 2021. Prior to that, Ms. Hawkins served as Executive Principal for two RPS

high schools. Ms. Hawkins' performance throughout her tenure with RPS was phenomenal.

3.        On March 19, 2021, RPS sent Ms. Hawkins a letter explaining the reasons for its

decision to "reclassify" Ms. Hawkins to the role of teacher, which constitutes a significant

demotion.

1

4.      None of the reasons outlined in the March 19, 2021 letter had anything to do with Ms. Hawkins' performance as an Assistant Principal at Jefferson High School. The reasons that the letter gave for the reclassification were inaccurate and misleading.

5.      RPS's reasons for reclassifying Ms. Hawkins were a pretext to a discriminatory purpose.

6.      Ms. Hawkins now brings a five-count complaint alleging unlawful retaliation under Title VII of the Civil Rights Act of 1964 (Count I); unlawful discrimination on the basis of her disabilities under the Americans with Disabilities Act of 1990 (Count II); willful retaliation under the Family Medical Leave Act (Count III); and unlawful discrimination on the basis of Ms. Hawkins' race (Counts IV and V).

## II.      Parties

7.      Plaintiff Janice Hawkins is a citizen of Illinois. She lives in Machesney Park, Illinois.

8.      Ms. Hawkins is subject to the jurisdiction and venue of this court because the events underlying this lawsuit took place within the purview of this Court's jurisdiction and venue.

9.      Defendant Rockford Public Schools is an Illinois school district based in Rockford, Illinois.

10.      RPS is subject to the jurisdiction and venue of this court because the events underlying this lawsuit took place within the purview of this Court's jurisdiction and venue.

11.      Upon information and belief, RPS employs over 500 employees, all in Rockford.

## III.      Jurisdiction and Venue

12. Jurisdiction over Ms. Hawkins' claims is proper under 28 U.S.C. § 1331 because the claims in this lawsuit arise under federal law.

13. This court has personal jurisdiction over RPS because it is registered to do business in Illinois, and purposely and knowingly transacts business here.

14. Venue in this court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims at issue occurred within this judicial district of the United States District Court for the Northern District of Illinois.

## IV. Facts Supporting Plaintiff's Claims

15. Ms. Hawkins is a Black female. She was born in 1966.

16. Ms. Hawkins suffers from diabetes, high blood pressure, post-traumatic stress disorder ("PTSD"), chronic/acute depression, and chronic/acute anxiety. Ms. Hawkins' only diagnosis prior to July 2015 was high blood pressure, which was well-controlled.

17. Ms. Hawkins has a bachelor's degree from North Park University, with a major in Physical Education and a minor in psychology. Ms. Hawkins earned her Master of Science in Educational Leadership from Roosevelt University in Schaumburg, Illinois in May of 2000.

### A. *RPS recruits Ms. Hawkins to be Executive Principal of Guilford High School, where Ms. Hawkins excels.*

18. In 2012, Dr. Matthew Vosberg, RPS's Deputy Superintendent at the time, recruited Ms. Hawkins to be the Executive Principal at Guilford High School, a local high school within RPS. Dr. Vosberg recruited Ms. Hawkins to perform a school turn-around. Dr. Vosberg offered to place Ms. Hawkins at the top of the existing salary scale.

19. Ms. Hawkins accepted Dr. Vosberg's offer and began as Guilford High School's Executive Principal on July 1, 2012. Ms. Hawkins was paid commensurate with the top salary on the existing RPS pay scale, which was approximately $105,000.

20.     Dr. Vosberg was Ms. Hawkins' supervisor during her tenure with RPS.

21.     Although Guilford High School was viewed within RPS as its flagship school, at the time Dr. Vosberg recruited Ms. Hawkins, the school was on the decline in a number of categories. Student academic achievement, especially among Black and minority student populations, was on the decline; student truancy was up; sports and extracurricular participation was down; teacher and administrator turnover was high; and there was a public perception that the school was not safe.

22.     Approximately 1,800 students per year attended Guilford High School during Ms. Hawkins' tenure as Executive Principal. Approximately 110 Certified Staff and 30 support staff per year were employed at Guilford High School during Ms. Hawkins' tenure.

23.     As Guilford High School Executive Principal, Ms. Hawkins' responsibilities and duties included but were not limited to:

    a.  Instructional Leadership

    b.  Managing and balancing an annual budget of $500,000;

    c.  Overseeing the Master Scheduling for the students and staff;

    d.  Supervising general, bilingual, and special education staff;

    e.  Staff interviews, hiring, evaluations, coaching, discipline, and recommendations for non-renewal as appropriate.

    f.  Development and implementation of a School Improvement Plan aligned to the District and School Mission and Vision.

    g.  Facilitating the process for drafting SMART Goals, a tool designed to track and evaluate student achievement and growth;

h.  Creation, implementation, and evaluation of professional development opportunities for all staff members

i.  Coordination and support of professional learning communities among staff members for both teachers and administrators

j.  Data Analysis for achievement, discipline results, attendance, drop-out rates, students on track rates; graduation rates, student participation rates in sports and after-school activities, tutoring participation and success rates; staff turn-over rates; and general; and pass rates in core content areas

k.  Parent and Community  collaboration and engagement

l.  Emergency/Crisis Planning and Communication

m.  Oversight for compliance with Student Discipline protocols, due process rights and appeals and a safe building climate.

n.  Coordinator for Commencement and Award/Achievement Programs in recognition of student accomplishments.

o.  General Supervision including sports and after school events

24.  Ms. Hawkins' tenure at Guilford High School was a resounding success. Guilford High School's reputation vastly improved, both within RPS and beyond. Guilford was viewed as the standard for other high schools in RPS to emulate with respect to school culture and climate, and athletic and extracurricular participation.

25.  Ms. Hawkins' leadership led to the following accomplishments at Guilford High School:

a.  The 4-year graduation rate for all students improved from 63.9% in 2012 to 75.4% by 2015;

b.  The 4-year graduation rate for Black students improved from 50.3% in 2012 to 72.3% by 2015;

c.  Student attendance improved from 90% to 95.3%, which was 1.4% higher than the District average and 1.1% higher than the state average;

d.  Chronic truancy rate improved from 9.5% in 2012 to 0.4% in 2015;

e.  Black students performed above the District and State average on the ACT in both Reading and Math;

f.  Freshman On-Track rate in 2014 of 94.1% was higher than the District and State rate and recognized with a letter from a local legislator. Guilford's Freshman on-track was higher than the District rate each year of Ms. Hawkins tenure;

g.  Office Discipline Referrals were reduced by 50%;

h.  Out-of-school suspensions were reduced by 60%;

i.  Class tardiness reduced by approximately 50%;

j.  The average ACT scores improved from 18 to 20 (out of 36);

k.  Staff turnover significantly reduced from 33 new staff members in 2012 to five or fewer new staff members in 2013, 2014, and 2015;

l.  The number of students entering Guilford High School from private schools or the Gifted Academy at Auburn High School in Rockford increased significantly each year from 2012, and continued in that manner even beyond Ms. Hawkins 2015 tenure due to the supports and structures she had put in place.

26.     Dr. Vosberg, Deputy Superintendent, completed Ms. Hawkins' annual performance reviews, or "Summative Evaluations," every year that she served as Guilford High School's Executive Principal (2012 - 2015).

27.     Summative Evaluations rated performance on a host of sub-categories, as well as on overall performance.

28.     Ms. Hawkins received "Proficient" overall Summative Evaluations every year that she served as Guilford High School's Executive Principal, and received higher ratings in a number of sub-categories.

29.     Ms. Hawkins received a letter of recognition from a local Illinois legislator because of the exceptionally high percentage of freshmen (94.1%) on track for graduation on Guilford High School's State of Illinois Report Card.

30.     Due to Ms. Hawkins' vast accomplishments, her staff nominated her for the "Those Who Excel" Principal of the Year Award in 2013. Ms. Hawkins won the award at the regional level.

### B.   RPS recruits Ms. Hawkins to be Executive Principal of Auburn High School, where she excels.

31.     Because of the exceptional job that Ms. Hawkins did in turning around Guilford High School, in 2015, RPS Superintendent Ehren Jarrett and Dr. Vosberg recruited Ms. Hawkins to be the Executive Principal of Auburn High School in RPS.

32.     Dr. Jarrett and Dr. Vosberg recruited Ms. Hawkins to Auburn High School so that she could turn around Auburn High School in the same way that she turned around Guilford High School. They offered Ms. Hawkins a raise to do so.

33.     Ms. Hawkins accepted the Executive Principal role at Auburn High School, and began in her new role in July 2015.

34. Dr. Vosberg remained Ms. Hawkins' direct supervisor during her tenure as Auburn High School Executive Principal.

35. Dr. Jarrett placed a personal thank you call to Ms. Hawkins for accepting the Executive Principal role at Auburn High School.

36. Auburn High School is located in a high-crime area within Rockford. Auburn High School was suffering from performance issues when Ms. Hawkins accepted the Executive Principal role there. The students who lived in the Auburn High School zone were almost all low-income and/or minority students, with 99.9% of the disciplinary suspensions and expulsions coming from that population. Fights occurred several times a day. Students were commonly suspended and expelled for fighting, group violence, battery, weapons, threats and intimidation, drug possession and distribution, and interference with school personnel.

37. The graduation rate for Black students within the Auburn High School zone averaged approximately 53%. The freshman on-track rate for zone students was below 40%. This was a historic problem for Auburn High School.

38. Auburn High School houses the Gifted Academy and the Creative and Performing Arts ("CAPA") Academy. The Gifted and CAPA Academies draw students from all across Rockford. Students that attended the Gifted Academy were predominantly white and affluent. Students attending the CAPA Academy came from slightly more diverse backgrounds.

39. The Gifted Academy staff was all white, and has historically been predominantly or all white. The CAPA Academy had one Black female teacher and one Black Counselor; the remaining CAPA staff members were white.

40. The teacher population at Auburn High School is predominantly white.

41.     Although the Gifted Academy and CAPA performed well, the rest of Auburn High School suffered from low performance issues with students off-track with failing grades, chronic truancy, chronic referrals resulting in suspensions and expulsions, and lack of access to Advanced Placement Classes for Black and minority students.

42.     Approximately 2,000 students attended Auburn High School per year during Ms. Hawkins' tenure as Executive Principal. Approximately 120 certified staff were employed at Auburn High School per year during Ms. Hawkins' tenure.

43.     As Auburn High School Executive Principal, Ms. Hawkins' responsibilities and duties included:

    a.   Managing and balancing an annual budget of $600,000;

    b.   Overseeing the Master Scheduling for the students;

    c.   Supervising the curriculum for the Gifted, Creative and Performing Arts, and the Junior Reserve Officers' Training Corps (JROTC);

    d.   Creating and implementing professional learning opportunities for staff;

    e.   Assisting staff with selection and implementation of instructional strategies;

    f.   Monitoring early warning system toward SMART goal attainment on a weekly basis

    g.   Partnering with all seven Auburn Academies principals and staff (including those from Gifted Academy and CAPA) and comparing and analyzing school data;

    h.   Coordinating staff-driven mission, vision, and action plan by conducting a SWOT analysis. (Strengths, Weaknesses, Opportunities, and Threats.)

44.     As she did at Guilford High School, Ms. Hawkins' turned Auburn High School around to be a higher-performing school.

45.     Ms. Hawkins' leadership led to the following accomplishments at Auburn High School:

     a.  The overall graduation rate improved from 65% to 71% by 2017;

     b.  The graduation rate for AA students improved from 53.7% in 2015 to 61.6% in 2018;

     c.  College enrollment increased from 50.2% in 2015 to 58.6% in 2018;

     d.  Freshmen On-Track rate for all students increased from 54% to 62% by 2018;

     e.  Teacher retention significantly improved from 83% in 2015 to 90% in 2018 and the majority of those who left either retired or were promoted;

     f.  Teacher attendance significantly improved from 72% to 82% during the two years it was tracked on the State Report Card;

     g.  Out of school suspensions reduced by 50%;

     h.  Student attendance improved from 88% to 94%;

     i.  Office Discipline Referrals were reduced by 40%, which resulted in fewer students getting suspended and expelled;

     j.  Partnering with Equal Opportunity Schools to eliminate the Advanced Placement course participation gap among Black and minority student populations compared to their zone cohorts in other traditional high schools;

     k.  The Junior Reserve Officer Training Corps (JROTC) became a "Gold Star" Program, and one of the top programs in the nation;

l.  The number of Ivy League acceptances, perfect ACT scores, and National Merit Scholars increased;

m.  Athletic teams and clubs began competing at the Conference, Regional and the State Level in football, basketball, chess, Scholastic Bowl, golf, and tennis for boys and girls. The Quiz Bowl team dominated regional competition year after year.

46.  Ms. Hawkins' leadership also factored into Auburn High School being recognized by the Washington Post for two consecutive years as one of the top 100 public schools that challenge students academically, ranking as high as 11 among Illinois Schools.

47.  Ms. Hawkins developed a standard for electronically scanning students attending sporting and other school events that enabled Auburn High School to deny attendance to students who were suspended, expelled, or had too many tardies. This led to fewer negative behavior incidents at school events.

48.  Upon observing the success of the electronic scanning that Ms. Hawkins implemented, Dr. Vosberg implemented the system throughout RPS.

49.  Under Ms. Hawkins' leadership, Auburn High School was the only high school in RPS that developed a School Improvement Model, under which every teacher served on a School Improvement committee of their choice.

50.  Prior to Ms. Hawkins' arrival to Auburn High School, the school suffered from chronic turnover in leadership. In the 13 years prior to Ms. Hawkins serving as Auburn Executive Principal, Ms. Hawkins was the only Executive Principal to serve in that capacity for four consecutive years. Since 2005, Ms. Hawkins was the 7th principal; the only female principal, and the only principal over 50 years old when she began as Executive Principal.

11

### C. RPS subjects Ms. Hawkins to discriminatory treatment.

51.     On February 16, 2017, Ms. Hawkins emailed Dr. Vosberg and asked him how to file a complaint with Human Resources. Ms. Hawkins intended to file a complaint because she felt unsupported by Human Resources. Specifically, Human Resources insisted that they be present any time Ms. Hawkins intended to meet with her staff; they provided Ms. Hawkins directives that resulted in hostile relationships with teacher and clerical unions; they failed to post clerical positions in an effective way; they told Ms. Hawkins that she did not have the right to manage clerical staff; and they discussed Ms. Hawkins in a derogatory manner during clerical advisory meetings with the clerical union president when Ms. Hawkins was not present, including advising the union how to properly grieve Ms. Hawkins.

52.     Dr. Vosberg responded that all Principals, including Ms. Hawkins, should come directly to him with any complaints.

53.     Dr. Vosberg set up a meeting with the Executive Director of Human Resources Matthew Zediker, and the Human Resources Generalist Brandon Ely, who was assigned to Auburn High School.  Mr. Zediker became verbally aggressive towards Ms. Hawkins and alleged that a clerical worker who had been terminated had criticized Ms. Hawkins' performance during their exit interview. Ms. Hawkins refuted the allegations and offered proof that she did nothing wrong. Mr. Zediker said he would follow up to verify Ms. Hawkins' statement, but he never did.

54.     In Spring of 2017, Ms. Hawkins told Dr. Vosberg that she would like to return to Guilford High School. Ms. Hawkins told Dr. Vosberg that she wanted to return to Guilford High School because Auburn High School lacked an adequate level of administrative support. Ms. Hawkins also told Dr. Vosberg that she had to deal with complaints from Gifted Academy

students, staff, and parents because she disciplined students from the Gifted Academy under the same rules as those that applied to locally-based students. Ms. Hawkins also told Dr. Vosberg that her diabetes was uncontrolled as a result of the stress associated with her job.

55.     Dr. Vosberg laughed and told Ms. Hawkins, "Janice, you're stuck. I need you at Auburn.  You are doing a great job and now would not be the time to leave. You are the right person for this position."

56.     Dr. Vosberg instead placed Auburn High School's less-experienced white male Assistant Principal as the new Guilford High School Principal. Dr. Vosberg thanked Ms. Hawkins for training him.

57.     By the Fall of 2017, Ms. Hawkins had done an excellent job of improving the academic and work culture at Auburn High School.

58.     However, around that time, personnel issues began to arise at Auburn High School, and the predominantly white Auburn High School staff became hostile to Ms. Hawkins as a result.

59.     Ms. Hawkins did not receive the necessary support from Dr. Vosberg or other RPS personnel when dealing with the hostile work environment that the Auburn High School staff members created. Indeed, RPS leadership's actions helped to facilitate the hostile work environment.

60.     In the Fall of 2017, RPS Legal Department and Board Attorney recommended terminating a popular white male teacher at Auburn High School. The RPS Legal Department and RPS Board Attorney conducted an investigation into allegations that the teacher had stolen money from the Auburn High School Student Council, and concluded that he had.

61.     Ms. Hawkins followed the recommendation and terminated the teacher's employment.

62.     The terminated teacher spread misinformation among Auburn High School staff members suggesting that Ms. Hawkins wrongfully terminated him.

63.     Dr. Vosberg and RPS Human Resources were aware of the misinformation being spread about Ms. Hawkins, but did nothing about it.

64.     In January 2018, a white female teacher in the Gifted Academy accused a Black female Gifted Academy student of cheating.

65.     Ms. Hawkins conducted an investigation into the matter, and concluded that the student did not cheat.

66.     The Gifted Academy teacher became angry with Ms. Hawkins and was insubordinate to her.

67.     Rather than support Ms. Hawkins, Dr. Vosberg and the head of Human Resources at RPS penalized Ms. Hawkins. RPS took away Ms. Hawkins' ability to discipline Auburn High School staff. Dr. Vosberg told Ms. Hawkins that going forward, the Auburn High School Assistant Principal – a white male – would handle all staff discipline.

68.     No other RPS Principal – most or all of whom were white and male – had their authority to discipline staff revoked.

69.     On or around February 23, 2018, the Gifted Academy staff spearheaded an attack against Ms. Hawkins. The Gifted Academy staff met with members of RPS Human Resources and told them that they did not have confidence in Ms. Hawkins. The Gifted Academy staff's actions were motivated by the termination of the teacher who stole from the Auburn High School Student Council, and Ms. Hawkins finding that the Black student had not cheated.

14

70.     The Gifted Academy staff also encouraged alumni to write letters to RPS board members demanding Ms. Hawkins' termination.

71.     In late February 2018, an RPS Central Office employee and parent of a student in the Gifted Academy met with Ms. Hawkins. She told Ms. Hawkins that an RPS board member had stated, "What they are doing to Janice over at Auburn is racist." The parent also shared screenshots of the social media posts from the Gifted Academy staff about Ms. Hawkins.

72.     Ms. Hawkins met with Dr. Vosberg, RPS outside counsel Jim Pirages, and RPS Human Resources Generalist Leah Williams. Ms. Hawkins told them about the social media campaign against her, and the board member's remark that the Gifted Academy staff's actions were racist. Ms. Hawkins informed them that she felt attacked by the staff, and that she felt the attacks were discriminatory based on her race. Ms. Hawkins also shared the biased treatment that the few Black CAPA teachers were also subjected to.

73.     On or around March 5, 2018, Dr. Vosberg called Ms. Hawkins while she was at home sick due to her having high glucose levels. Dr. Vosberg ordered Ms. Hawkins to come to attend a meeting at Auburn High School that day with himself, the teachers' union President and Vice President, several teacher leaders, Mr. Zediker, and the Human Resources Generalist assigned to Auburn High School.

74.     Everyone at the meeting was white except for Ms. Hawkins and the Human Resources Generalist, who was there to take notes.

75.     The union representatives outlined teachers' grievances about Ms. Hawkins, which generally focused on the terminated teacher who stole money from the Student Council.

76.     Ms. Hawkins was denied the opportunity to respond to the grievances, and could not disclose the real reason for the teacher's termination.

15

77.     At the meeting, Ms. Hawkins was asked by Dr. Vosberg and the union Vice President if she would be open to participating in team building sessions with Auburn High School staff. Ms. Hawkins said that she would be.

78.     After the meeting, the teacher representatives present at the March 5th meeting communicated to other non-present Auburn High School teachers that they refused to participate in team-building meetings with Ms. Hawkins. The teacher representatives said they felt that participating in team building with Ms. Hawkins was akin to being forced to meet with your rapist.

79.     Instead, the teachers insisted on participating in the team building with the Auburn High School Assistant Principal (a white male) who had been put in charge of staff discipline and meeting with union representatives by Dr. Vosberg.

80.     Dr. Vosberg ordered Ms. Hawkins to permit the teacher representatives to meet with the Assistant Principal instead of with her.

81.     Around this time, Ms. Hawkins informed Dr. Vosberg that she believed that the staff's actions against her were racist. Dr. Vosberg did not believe her.

82.     Ms. Hawkins also told Dr. Vosberg that she was targeted due to her age, sex, and her diabetes, which sometimes caused her to miss work.

83.     Ms. Hawkins was diagnosed with diabetes in December of 2015. Dr. Vosberg knew of Ms. Hawkins' diabetes. He told Ms. Hawkins that he did not know much about diabetes but that he did know that those who have it can lose limbs. At various times Dr. Vosberg would tell Ms. Hawkins that he was concerned about her health.

84.     On or around March 19, 2018, Dr. Vosberg met with Ms. Hawkins and gave her a Proficient rating for her Summative Evaluation. Dr. Vosberg told Ms. Hawkins that she was the

16

"right person for the job." He also told Ms. Hawkins that the teachers were disgruntled about the terminated teacher, but unfortunately, Ms. Hawkins and RPS could not tell the truth regarding the teacher's theft. Dr. Vosberg told Ms. Hawkins that as long as he was happy, that was all that mattered because he was the only one she needed to please. Dr. Vosberg concluded by saying, "if not you Janice, then who?"

85.     The staff at Auburn High School continued to create a stressful and hostile work environment for Ms. Hawkins.

86.     The Auburn High School staff filed a slew of meritless grievances against Ms. Hawkins with their union. Ms. Hawkins prevailed in each grievance.

87.     The teacher's union President met with Dr. Vosberg and Superintendent Dr. Jarrett regularly over lunch and discussed Ms. Hawkins.

88.     Ms. Hawkins communicated with RPS Human Resources complaining about the hostile work environment created by the staff at Auburn High School.

89.     In April 2018, the RPS Legal Department responded to Ms. Hawkins and told her that it would investigate Ms. Hawkins' complaint regarding the hostile work environment.

90.     As part of the investigation, Ms. Hawkins was interviewed by RPS outside counsel Jim Pirages, Dr. Vosberg, and Human Resources Generalist Leah Williams.

91.     During the interview, Ms. Hawkins complained about the hostile work environment at Auburn High School created by the staff, and shared her belief that the mistreatment was based on her race, and on her being a woman.

92.     Ms. Hawkins also communicated her belief that her mistreatment was due to her having diabetes.

93.     Ms. Hawkins stated at the meeting that her secretary, a white female, also believed that Ms. Hawkins' mistreatment was racist.

94.     During the interview, Human Resources Generalist Leah Williams stated that she agreed that Ms. Hawkins' treatment was racist in nature.

95.     Dr. Vosberg reacted to the allegations regarding Ms. Hawkins' mistreatment by expressing his confusion and annoyance. He did not directly address the issues of discrimination, nor did he take them seriously.

96.     Dr. Vosberg told Ms. Hawkins that Mr. Zediker viewed her as the problem.

97.     Dr. Vosberg created a list of several "action" items for Ms. Hawkins to accomplish to remedy the supposed shortcomings in her performance, despite the fact that Ms. Hawkins had not been cited for any violation of RPS policy.

98.     In June 2018, the final faculty meeting at Auburn High School took place. During that meeting, a retiring white male teacher, who was also a union representative, threw an Afro wig to the white male incoming Assistant Principal. The teacher then remarked, "here, you are going to need this next year if you're going to work here."

99.     Many of the teachers and staff at the meeting laughed at the gesture and remark. The non-white staff members did not. Two counselors, both of whom were Black, complained to the Assistant Principal, who then told Ms. Hawkins that Human Resources had instructed him to walk the teacher out of the building and instruct him not to return.

100.    Although Ms. Hawkins was not involved in the discipline, Auburn High School staff members blamed Ms. Hawkins for the retiring teacher being walked out.

101.    The retiring teacher told an Auburn High School Assistant Principal that he would drop a grievance that he had filed against Ms. Hawkins if she could hand him Ms. Hawkins' head on a silver platter.

102.    Ms. Hawkins notified Dr. Vosberg, Jim Pirages, Lori Hoadley, and RPS Human Resources regarding the Afro wig incident, and cited it as continued racist behavior against her and other staff members of color from the predominantly white staff members at Auburn High School.

103.    During the week of June 18, 2018, Ms. Hawkins was summoned for a Conclusion of the Investigation meeting regarding her hostile work environment complaint. Ms. Hawkins, Jim Pirages, Lori Hoadley, Dr. Vosberg, and a member of Human Resources were present.

104.    Ms. Hawkins was told that her allegations of racist and hostile work environment were unfounded. Ms. Hawkins was also told that she needed to create a plan to address the ongoing personnel issues at Auburn High School.

105.    Ms. Hawkins requested a copy of the investigation summary and notes. Mr. Pirages refused her request.

106.    As the meeting concluded and Ms. Hawkins was leaving the room, she noticed that Jim Pirages, Lori Hoadley, Dr. Vosberg, and the member of Human Resources were smirking.

107.    During the week of June 25, 2018, Dr. Vosberg called Ms. Hawkins while she was on vacation. Dr. Vosberg told Ms. Hawkins that he needed to meet with her, and required her to cancel her vacation day in order to meet with him.

108.    When Ms. Hawkins arrived to the meeting, Dr. Vosberg was seated alone at a table in his office. He informed her that Mr. Zediker would be joining the meeting shortly.

109.     During the meeting, Dr. Vosberg reversed course from what he had previously expressed to Ms. Hawkins during her March 2018 Summative Evaluation meeting. During the March 2018 Summative Evaluation meeting, Dr. Vosberg told Ms. Hawkins that the only concern he had was that she needed to make sure staff evaluations were completed by her and her administrative team the following year.

110.     All of the previous teacher allegations made by the teachers at Auburn High School and their union President were now a concern that needed to be addressed. When Ms. Hawkins had offered proof that the allegations were false, Dr. Vosberg told her, "Janice, it's just disgruntled staff about [the teacher who stole from the Student Council and the teacher who made the cheating accusations].  I know how hard you are working and I'm not worried about it."

111.     A few days later, Ms. Hawkins received a memorandum outlining the issues that were discussed during the meeting.

112.     Ms. Hawkins told Dr. Vosberg that the memorandum read like a "Notice of Remedy," which is a last chance remedy of deficiencies that need to be addressed, or the person will be terminated at the conclusion of the contractual year.

113.     Dr. Vosberg responded in a phone call. He sounded annoyed and told Ms. Hawkins that it "was just a memo," but that Ms. Hawkins was nevertheless responsible for addressing the issues therein.

114.     Only one issue in the memorandum was legitimate: that Ms. Hawkins would need to make sure staff evaluations were completed in a timely manner. However, Ms. Hawkins had already done a self -assessment as part of the evaluation process prior to the March Summative Evaluation Meeting and noted that she needed to improve on completion of staff evaluations by

20

herself and her administrative team. The remaining supposed concerns regarding Ms. Hawkins'
performance were spawned by inaccurate and derogatory complaints from Auburn High School
staff members.

115.    In a good faith attempt to address the issues with Auburn High School personnel,
Ms. Hawkins received permission from Dr. Vosberg and the RPS Legal Department for a team-
building retreat with her administrative team, the Gifted Academy clerical team, and Auburn
High School teacher leaders who were actively working against her the previous school year.
Many of the teacher leaders did not attend, making it impossible for Ms. Hawkins to build
rapport with the Auburn High School staff members.

116.    On August 24, 2018, during a home football game on Auburn High School's
campus, gunfire could be seen and heard from the football stadium. Ms. Hawkins was not
scheduled to supervise the game, but did so out of a sense of responsibility and loyalty to the
school. At the time of the gunfire, Ms. Hawkins was using the bathroom, a symptom of her
uncontrolled diabetes. Ms. Hawkins quickly returned, and ushered terror-stricken adults and
students to the nearby field house for safety.

117.    During the week of August 27, 2018, Ms. Hawkins was called to a meeting at
RPS Central Office, where the RPS Director of Safety concluded that Auburn High School
responded appropriately to the incident. However, Dr. Vosberg alleged that Ms. Hawkins was
delinquent for leaving the track to go to the bathroom. Ms. Hawkins explained that she was not
scheduled to supervise, that the gunfire occurred just as she was returning to the stadium, and
that she helped usher people to safety. Dr. Vosberg was not satisfied with Ms. Hawkins'
response, and said that she should always be at games for supervision.

118.    Dr. Vosberg emailed all of the RPS high school principals and inquired about their supervision schedule for games.  All of the Principals responded that they assign and delegate supervision duties to other staff.

119.    Despite the principals' response, Dr. Vosberg was dissatisfied with Ms. Hawkins. He told Ms. Hawkins that because "Auburn is Auburn," Ms. Hawkins should be at all home games in the future. He did not require this of the other high school principals.

120.    After the meeting, Ms. Hawkins sent a text message to Superintendent Dr. Jarrett and told him that she felt that Dr. Vosberg was bullying her. The complaint was sent confidentially.

121.    Dr. Jarrett responded that the matter would be turned over to Human Resources.

122.    Despite the fact that Ms. Hawkins submitted her bullying complaint confidentially, Dr. Vosberg learned about Ms. Hawkins' complaint shortly after the complaint.

123.    Upon information and belief, Mr. Zediker told Dr. Vosberg about Ms. Hawkins' confidential complaint.

124.    Dr. Vosberg promptly visited Ms. Hawkins and told her, "Janice, you don't trust your supervisor. That's a problem."

125.    On August 31, 2018, a senior Auburn High School cheerleader died of an asthma attack following a football game at Guilford High School. The student's death distressed Ms. Hawkins and the Auburn High School community at large.

126.    Shortly thereafter, on or around September 2, 2018, Ms. Hawkins was experiencing severe chest pain. She visited the emergency room on Sunday evening, but returned home against the physician's instructions because she did not want to miss school the following day.

127. Ms. Hawkins' condition did not improve, and she visited her physician the following day. Her physician advised that she suffered a heart attack. Ms. Hawkins was then transported to the hospital by ambulance.

128. Ms. Hawkins called Dr. Vosberg at approximately 10:30 a.m. and left a message with his secretary stating that she was on her way to the hospital with a suspected heart attack. Dr. Vosberg did not respond to Ms. Hawkins' call until approximately 7:30 pm.

129. At the hospital, Ms. Hawkins was diagnosed with PTSD, chronic/acute depression, and chronic/acute anxiety.

130. Her conditions came about and were triggered by the gunfire during the Auburn High School, the death of the cheerleader days earlier, the overall stress from the discriminatory and hostile work environment at Auburn High School, and the lack of support she was experiencing from Dr. Vosberg, Mr. Zediker, and the Dr. Jarrett.

131. Beginning in October 2018, Ms. Hawkins took leave under the FMLA. Ms. Hawkins took leave until December 2018, when her FMLA leave was exhausted.

132. Once her FMLA leave was exhausted, Ms. Hawkins took leave under the ADA.

133. In February 2019, Ms. Hawkins' physician cleared her to return to work, but requested that she be placed in an administrative position at the Central Office in the Department of Student Services and Alternative Learning as a reasonable accommodation until her clinical symptoms could be consistently managed. The physician believed that returning to Auburn High School would be harmful to Ms. Hawkins' mental health.

134. On February 19, 2019, Ms. Hawkins submitted a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights (IDHR), Charge No. 440-2019-02517. The February 19, 2018 Charge alleged that RPS

unlawfully discriminated against Ms. Hawkins on the basis of her race, sex, age, and disability. The Charge also alleged that RPS unlawfully retaliated against Ms. Hawkins for engaging in activity. *See* **Exhibit 1**, EEOC Charge dated February 19, 2019.

135. RPS Human Resources refused her reasonable accommodation request. Instead, on or around March 11, 2019, RPS threatened Ms. Hawkins with termination. In response, Ms. Hawkins sent a message to the RPS Board of Directors regarding the threat of termination. This caused RPS to refrain from terminating Ms. Hawkins.

136. Around this time, RPS placed Ms. Hawkins on an unpaid leave of absence.

137. Ms. Hawkins did not return to Auburn High School, or any other school at this time.

138. While Ms. Hawkins was on unpaid leave, RPS hired her replacement at Auburn High School.

139. Prior to Ms. Hawkins' request, RPS had previously transferred employees from a school setting to an alternative administrative position which was often the Central Office building itself. RPS had previously transferred employees who were males, and who did not suffer from known disabilities.

140. On or about March 18, 2019, Ms. Hawkins' psychiatrist recommended that Ms. Hawkins be placed on leave to care for her PTSD, chronic/acute depression, and chronic/acute anxiety due to the stress created by RPS's threats and intimidation tactics during Ms. Hawkisn' reasonable request negotiations.

141. Ms. Hawkins was eventually cleared to return to work on June 10, 2019.

142. RPS placed Ms. Hawkins on unpaid leave.

143.    RPS has claimed that it was not made aware that Ms. Hawkins was cleared to return to work until late-December 2019.

144.    RPS has neither offered nor given Ms. Hawkins back pay for any of the time since she was cleared to return to work starting on June 10, 2019, even though she had requested it through her previous attorney in an email to Mr. Zediker.

145.    On or around October 30, 2019, Ms. Hawkins filed a second Charge of Discrimination with the EEOC and IDHR, Charge No. 440-2020-00726. The October 30, 2019 Charge alleged that RPS had discriminated against Ms. Hawkins based on her disability, failed to provide a reasonable accommodation for her disability, and unlawfully retaliated against her for filing the February 19, 2019 Charge of Discrimination with the EEOC and IDHR. *See* **Exhibit 2**, EEOC Charge dated October 30, 2019.

146.    On January 30, 2020, Ms. Hawkins applied to be considered for Executive Director of Secondary Schools, a newly-created position at RPS's Central Office.

147.    Ms. Hawkins possessed all of the stated qualifications for the position.

148.    Ms. Hawkins, through her attorney, communicated to Jim Pirages that she was interested in the position.

149.    Ms. Hawkins was never contacted by RPS regarding the position.

150.    On February 21, 2020, Mr. Zediker contacted Ms. Hawkins and told her that he had recently learned that she was eligible to return to work, and that she would be placed at Jefferson High School as the 12-month Curriculum Assistant Principal. Ms. Hawkins was also told that she would be retaining the same salary that she earned while Executive Principal of Auburn High School.

### D. Ms. Hawkins continues to excel as Assistant Principal of Jefferson High School, but is reclassified to the role of teacher based on reasons that have nothing to do with her performance.

151. Ms. Hawkins reported to Jefferson High School for her first day of work on February 24, 2020.

152. Ms. Hawkins reported to Jefferson High School Principal Donald Rundall February 24, 2021.

153. Dr. Vosberg arrived at Jefferson High School that same day. Dr. Vosberg attended, but did not participate in a meeting between Mr. Rundall, Ms. Hawkins, and other Jefferson High School staff members.

154. Upon information and belief, Dr. Vosberg went to Jefferson High School that day to intimidate Ms. Hawkins.

155. From time to time, Mr. Rundall would casually ask Ms. Hawkins whether she intended to apply to any other jobs outside of RPS. Mr. Rundall would tell Ms. Hawkins that he would write her a positive letter of recommendation.

156. One such conversation occurred in March 2020. Ms. Hawkins responded that she would be looking for a different opportunity, but would only leave if she found the right fit.

157. Over the course of the next several months, Mr. Rundall would periodically ask Ms. Hawkins whether she intended on applying for other jobs outside of RPS. Each time, Ms. Hawkins responded that she did not, and that she was content with her position.

158. Mr. Rundall was happy with Ms. Hawkins' performance. For example, Mr. Rundall praised Ms. Hawkins for her work as the Jefferson High School Master Scheduler. RPS sent a congratulatory letter to Jefferson High School based on Ms. Hawkins' scheduling work.

159. Mr. Rundall told an administrative intern that Ms. Hawkins was the smartest person he knew, and that she should consult with Ms. Hawkins.

26

160.    In October 2020, Mr. Rundall held a goal-setting meeting as part of the evaluation process. Mr. Rundall told Ms. Hawkins that the staff at Jefferson High School were saying good things about her, that she was a good fit for Jefferson High School, and that she was welcome to stay at Jefferson High School for as long as she wanted and that he loved having her there.

161.    In late November of 2020, Mr. Rundall again told Ms. Hawkins that she was doing an excellent job. Mr. Rundall's son visited Jefferson High School. Mr. Rundall introduced his son to Ms. Hawkins and told his son that Ms. Hawkins was the smartest person that he knew.

162.    In January 2021, Mr. Rundall again asked Ms. Hawkins whether she had applied for any jobs. She truthfully responded that she had not. Mr. Rundall requested for her to keep him up to date. Ms. Hawkins responded that she would.

163.    In late January or early February 2021, Mr. Rundall accompanied Ms. Hawkins to perform an informal observation of a teacher's classroom. Mr. Rundall expressed to Ms. Hawkins how impressed he was with her engagement and feedback to the teacher, and how impressed the Jefferson High School staff was with Ms. Hawkins' feedback, noting that they found her feedback constructive and easy to follow.

164.    Mr. Rundall scheduled Ms. Hawkins' Summative Evaluation meeting on or around February 26, 2021.

165.    Prior to this meeting, Mr. Rundall only had positive things to say regarding Ms. Hawkins' performance.

166.    When Ms. Hawkins arrived to the February 26, 2021 Summative Evaluation meeting, she discovered that Mr. Rundall was accompanied by Human Resources Generalist Margaret Schultz.

167.     Mr. Rundall's demeanor during the meeting was completely different from his previous, positive demeanor when interacting with Ms. Hawkins.

168.     At the meeting, Mr. Rundall told Ms. Hawkins that she was being reclassified from her current role to the role of classroom teacher, and that her last day as Assistant Principal would be on June 30, 2021. Ms. Hawkins was blindsided, devastated, and in shock. She was in tears as she shared the news with her Jefferson High School colleagues, who were as shocked as she was.

169.     The Human Resources Generalist told Ms. Hawkins that as a teacher, she would earn $65,000 rather than her current $130,500; that her last paycheck would be June 25, 2021; and that she would not receive any pay over July and August because her first teacher check would not be until September 3, 2021, assuming that she would be rehired.

170.     Ms. Hawkins asked Mr. Rundall why she was being reclassified to the role of teacher instead of just adjusting her salary consistent with that of a 12-month Assistant Principal.

171.     Mr. Rundall responded that he could not answer the question, but that he would pass the question along to Mr. Zediker.

172.     Ms. Hawkins told Mr. Rundall that she was shocked and that the reclassification was unexpected. Mr. Rundall told Ms. Hawkins that he had some of the same questions, that he would be waiting for Human Resources to answer them, and that he would let her know.

173.     On March 1, 2021, Ms. Hawkins asked Mr. Rundall again if he had heard from Human Resources. He said he had not.

174.     On March 8, 2021, Ms. Hawkins again asked Mr. Rundall if he had heard from Human Resources. He said he had not.

175. On March 8, 2021, Ms. Hawkins called HR Generalist for Jefferson High School Ms. Schultz and asked why she was being reclassified instead of having her salary adjusted consistent with other Assistant Principals.

176. Ms. Schultz told Ms. Hawkins that she could not answer her questions, and that Mr. Zediker would need to answer the questions. Ms. Schultz indicated that she thought Ms. Hawkins' question was legitimate and deserved an answer.

177. On March 19, 2021, Jim Pirages sent Ms. Hawkins a letter that outlined the reasons for RPS's decision to reclassify her.

178. The letter states in relevant part as follows:

> First, as an administrator you have most recently performed the duties of assistant principal at Jefferson High School while receiving the higher pay of a principal. It has been a substantial time period since you last performed principal duties that would otherwise support your higher pay. Moreover, your performance was inadequate when you last served as a principal of Auburn High School, and you were advised of the performance inadequacies while serving as principal of Auburn High School.

> Second, while since serving as an administrator (as an assistant principal at Jefferson High School), you have stated that you did not intend to remain in that position and that you intended to pursue employment opportunities other than the assistant principal position and outside of the Rockford Public School District. Given the importance of that role, the Board of Education cannot justify continuing to have you in an administrator position for which you have demonstrated a lack of commitment; at a salary level not commensurate with the duties of that position; and at a salary level that is based on a prior position, the duties of which you have previously demonstrated you cannot adequately perform. Therefore, reclassification is in the best interests of the Rockford Public School District.

179. The March 19, 2021 letter did not mention anything regarding Ms. Hawkins' performance as the Jefferson High School Assistant Principal.

180.    The March 19, 2021 letter did not state why Ms. Hawkins was not reclassified to the role of Assistant Principal.

181.    The March 19, 2021 letter falsely and negatively characterized Ms. Hawkins' performance as Executive Principal of Auburn High School.

182.    The March 19, 2021 letter purposely mischaracterized Ms. Hawkins' supposed intention to leave RPS for another job.

183.    There is no policy or practice in RPS that prohibits RPS employees from applying for jobs outside of RPS.

184.    On March 30, 2021, a private hearing was held regarding RPS's decision to reclassify Ms. Hawkins. Ms. Hawkins attended with her attorney. Also attending were RPS's attorney Lori Hoadley, RPS's outside counsel Jim Pirages, Dr. Vosberg, Mr. Zediker, and the RPS board members.

185.    Ms. Hawkins' attorney asked a question of the RPS board members and employees regarding the March 19, 2021 letter.

186.    At that time, Mr. Pirages informed Ms. Hawkins' attorney that no one from RPS would be answering any questions. Ms. Hawkins and her attorney left the meeting.

187.    RPS scheduled a public hearing regarding Ms. Hawkins' reclassification for April 27, 2021.

188.    Prior to the April 27, 2021 public hearing, RPS posted the March 19, 2021 letter on its public website.

189.    RPS's decision to publish the misleading letter on its website was designed to humiliate Ms. Hawkins and tarnish her reputation.

190.    On April 27, 2021, a public hearing was held before the RPS board regarding Ms. Hawkins' reclassification.

191.    Ms. Hawkins, through her counsel, explained that the reclassification decision was not based on Ms. Hawkins' performance as an Assistant Principal, that Ms. Hawkins' performance while Executive Principal at Auburn High School was Proficient, that Ms. Hawkins had been retaliated against, and that Ms. Hawkins' supposed intention to leave RPS was inaccurate and misleading.

192.    The RPS Board upheld its decision to reclassify Ms. Hawkins.

193.    Following her Board Hearing outcome, Ms. Hawkins applied for two administrative positions with RPS. Ms. Hawkins was qualified for both positions.

194.    Ms. Hawkins applied for the vacancy of RPS Chief of Schools. The Superintendent's secretary called Ms. Hawkins and scheduled an interview for the Chief of Schools position.

195.    However, Mr. Zediker subsequently emailed Ms. Hawkins stating that it was an error on the part of RPS, and that she will not be interviewed for the Chief of Schools position.

196.    Ms. Hawkins also applied to be considered for the Director of Diversity, Equity, and Inclusion. Ms. Hawkins was not contacted about her application.

197.    Upon information and belief, Ms. Hawkins is on a "do not hire" list with RPS.

198.    On April 7, 2021, Ms. Hawkins received a Right to Sue Letter from the EEOC with respect to her EEOC Charge that she filed on October 30, 2019, Charge No. 440-2020-00726. *See* **Exhibit 3**, Dismissal and Notice of Rights Letter dated March 9, 2021.

199.    Ms. Hawkins has been damaged due to RPS's discriminatory, retaliatory, and unfair treatment.

**COUNT I: RPS unlawfully retaliated against Janice Hawkins in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e-3(a)**

200.     Ms. Hawkins realleges and restates each of the above paragraphs and incorporates them here.

201.     RPS is an "employer" as defined by 42 U.S.C. § 2000e.

202.     Ms. Hawkins was Defendant's "employee" as defined by 42 U.S.C. § 2000e during all times relevant to this lawsuit.

203.     Ms. Hawkins filed a Charge of Discrimination with the EEOC and IDHR on February 19, 2019. *See* **Exhibit 1**.

204.     RPS retaliated against Ms. Hawkins for filing the February 19, 2019 Charge of Discrimination.

205.     RPS refused to allow Ms. Hawkins to return to work, and placed her on unpaid leave in or around June 10, 2019, because she filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

206.     RPS reclassified Ms. Hawkins to the role of teacher because she filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

207.     RPS published the inaccurate and misleading March 19, 2021 letter regarding Ms. Hawkins' performance because she filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

208.     RPS did not consider Ms. Hawkins' January 30, 2020 application to be considered for Executive Director of Secondary Schools because she filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

209.     RPS did not consider Ms. Hawkins' application to be considered for the Chief of Schools position because she filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

210.     RPS did not consider Ms. Hawkins' application to be considered for the Director of Diversity, Equity, and Inclusion position because she filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

211.     RPS published the inaccurate and misleading March 19, 2021 reclassification letter because Ms. Hawkins filed the February 19, 2019 EEOC and IDHR Charge of Discrimination.

212.     RPS's actions in response to Ms. Hawkins' February 19, 2019 EEOC and IDHR Charge of Discrimination constitute unlawful retaliation.

213.     Ms. Hawkins has exhausted her administrative remedies.

214.     Ms. Hawkins has been damaged by RPS's retaliation. She has lost her income, has suffered emotional distress, has been deprived of job opportunities, and has had her reputation unfairly tarnished as a result of RPS's retaliation.

## COUNT II: RPS unlawfully discriminated against Janice Hawkins based on her disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(a)

215.     Ms. Hawkins realleges and restates each of the above paragraphs and incorporates them here.

216.     RPS is a "covered entity," as that term is defined under 42 U.S.C. § 12111(2).

217.     Ms. Hawkins was an "employee" of RPS as that term is defined under 42 U.S.C. § 12111(4).

218.     Ms. Hawkins suffered from "disabilities" – diabetes, PTSD, chronic/acute depression, and chronic/acute anxiety – as that term is defined under 42 U.S.C. § 12102(1).

219. RPS knew about Ms. Hawkins' disabilities.

220. Ms. Hawkins was qualified for the essential functions of her job as Assistant Principal of Jefferson High School.

221. RPS did not consider Ms. Hawkins' January 30, 2020 application for Executive Director of Secondary Schools because of her disabilities, despite the fact that she was qualified for the role.

222. RPS reclassified Ms. Hawkins to the role of teacher because of her disabilities.

223. RPS did not consider Ms. Hawkins' application to be considered for the Chief of Schools position because of her disabilities, despite the fact that she was qualified for the role.

224. RPS did not consider Ms. Hawkins' application to be considered for the Director of Diversity, Equity, and Inclusion position because of her disabilities, despite the fact that she was qualified for the role.

225. Ms. Hawkins has been damaged as a result of RPS's discrimination.

**COUNT III: RPS willfully retaliated against Janice Hawkins because she took leave under the Family and Medical Leave Act, in violation of 29 U.S.C. § 2615(a) and 29 C.F.R. § 825.220(c)**

226. Ms. Hawkins realleges and restates each of the above paragraphs and incorporates them here.

227. Ms. Hawkins was an "eligible employee," as that term is defined under 29 U.S.C. § 2611(2)(A).

228. RPS is an "employer" as that term is defined under 29 U.S.C. § 2611(4)(A).

229. Ms. Hawkins took leave under the FMLA in October 2018 to care for her PTSD, diabetes, chronic/acute depression, and chronic/acute anxiety.

230. RPS willfully retaliated against Ms. Hawkins because she exercised her rights under the FMLA.

34

231. RPS knew or should have known that retaliating against Ms. Hawkins because she exercised her rights under the FMLA was unlawful. RPS retaliated against Ms. Hawkins anyway.

232. RPS reclassified Ms. Hawkins to the role of teacher because she exercised her rights under the FMLA.

233. RPS did not consider Ms. Hawkins' January 30, 2020 application for Executive Director of Secondary Schools because she exercised her rights under the FMLA.

234. RPS did not consider Ms. Hawkins' application for the Chief of Schools position because she exercised her rights under the FMLA.

235. RPS did not consider Ms. Hawkins' application to be considered for the Director of Diversity, Equity, and Inclusion position because she exercised her rights under the FMLA.

236. Ms. Hawkins has been damaged as a result of RPS's retaliation.

### COUNT IV: RPS unlawfully discriminated against Janice Hawkins based on her race, in violation of 42 U.S.C. § 1981

237. Ms. Hawkins realleges and restates each of the above paragraphs and incorporates them here.

238. RPS subjected Ms. Hawkins to disparate treatment based on her race.

239. RPS subjected Ms. Hawkins to a hostile work environment based on her race.

240. Ms. Hawkins has suffered adverse employment actions based on RPS's disparate treatment and hostile work environment.

241. RPS reclassified Ms. Hawkins to the role of teacher because she is Black.

242. RPS did not consider Ms. Hawkins' January 30, 2020 application for Executive Director of Secondary Schools because she is Black.

243.    RPS did not consider Ms. Hawkins' application for the Chief of Schools position because she is Black.

244.    RPS did not consider Ms. Hawkins' application to be considered for the Director of Diversity, Equity, and Inclusion position because she is Black.

245.    Ms. Hawkins has been damaged as a result of RPS's disparate treatment and hostile work environment.

## COUNT V: RPS unlawfully discriminated against Janice Hawkins based on her race, in violation of 42 U.S.C. § 1983

246.    Ms. Hawkins realleges and restates each of the above paragraphs and incorporates them here.

247.    RPS subjected Ms. Hawkins to disparate treatment based on her race.

248.    RPS subjected Ms. Hawkins to a hostile work environment based on her race.

249.    Ms. Hawkins has suffered adverse employment actions based on RPS's disparate treatment and hostile work environment.

250.    RPS reclassified Ms. Hawkins to the role of teacher because she is Black.

251.    RPS did not consider Ms. Hawkins' January 30, 2020 application for Executive Director of Secondary Schools because she is Black.

252.    RPS did not consider Ms. Hawkins' application for the Chief of Schools position because she is Black.

253.    RPS did not consider Ms. Hawkins' application to be considered for the Director of Diversity, Equity, and Inclusion position because she is Black.

254.    Ms. Hawkins has been damaged as a result of RPS's disparate treatment and hostile work environment.

## PRAYER FOR RELIEF

255.    WHEREFORE, Plaintiff Janice Hawkins requests that this Court enter judgment in her favor and against Defendant Rockford Public Schools and award damages in an amount to be proven at trial, which include:

    a)  Compensatory damages (including interest and benefits);

    b)  Back pay (including interest and benefits);

    c)  Front pay (including interest and benefits);

    d)  Exemplary and punitive damages in an amount commensurate with Defendant's ability to pay and to deter future conduct;

    e)  Statutory damages;

    f)  Liquidated damages;

    g)  Costs incurred by this lawsuit, including attorneys' fees to the extent allowable by law;

    h)  Pre-judgment and post-judgment interest, as provided by law; and

    i)  Such other and further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

256.    Ms. Hawkins demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38.

Date:   July 5, 2021                          Respectfully submitted,


                                              JANICE HAWKINS


                                              */s/ Alexandros Stamatoglou*
                                              Plaintiff's attorney

Alexandros Stamatoglou
Villalobos & Associates
1620 W. 18th Street
Chicago, Illinois 60608
Ph: (312) 666-9982
astamatoglou@villaloboslaw.com